Filed 9/9/15  In re P. S. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re P. S.,<br><br>a Person Coming Under the Juvenile Court Law. | B259207<br>(Los Angeles County<br> Super. Ct. No. DK04291) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>A. S.,<br><br>     Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daniel Zeke Zeidler, Judge.  Affirmed.

Amy Z. Tobin, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Peter Ferrera, Deputy County Counsel, for Plaintiff and Respondent.

A. S. (Mother) challenges the dependency court's jurisdictional and dispositional orders under Welfare and Institutions Code section 300, subdivisions (b) and (c)[1] with respect to her son P. S. (born June 2008).[2] Mother contends that her due process rights were violated by three evidentiary rulings made by the juvenile court. She further contends that the evidence was insufficient to sustain the court's jurisdictional findings and the court's dispositional order removing P. from her care. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*Detention Report and Hearing*

In September 2008, a family law court ordered the parents to share 50/50 joint legal and physical custody of P. Between 2008 and 2013, P. was the subject of six investigations of allegations of abuse and neglect. All of the allegations were deemed inconclusive or unfounded. From August through October of 2013, Mother and Father filed numerous motions and requests for restraining orders against each other in the family law court.

In October 2013, the Los Angeles County Department of Children and Family Services (DCFS) received a referral alleging emotional and physical abuse of P. by Mother. The referral alleged that P. reported that Mother was forcing him to lie to the police and was "planning to do things to (hurt) father. [P.] reported that his mother told him that if he did not lie, she would hurt him."

---

[1]     Further unspecified statutory references are to the Welfare and Institutions Code.

[2]     Father, P. B., is not a party to this appeal. Mother has a daughter, Britney, whose father's whereabouts were unknown.

2

The DCFS caseworker spoke with Laura Mullen, an intake therapist at Foothill Family Services, who stated that Mother had come to the agency to report that P. was "aggressive, defiant and angry," and had been abused by Father. When Mullen introduced herself to P., "he blurted out quickly 'My dad touches my butt' in an unnatural way, which suggested the child was coached to say it." Mother did not return for services, and Father expressed the belief that Mother was "manipulating [P.] to lie in therapy."

On October 25, 2013, a DCFS caseworker attempted to meet with P., but he was not at school. The caseworker called Mother, who said that she did not want DCFS social workers to interview P. "until law enforcement was done with a new child sexual abuse case" against Father. Mother further stated that Father was going to be arrested by the Beverly Hills Police Department and that P. "was 'psychotic and ripping out his hair' due to the abuse." The caseworker found Mother's "demeanor and tone" to be unusual because she sounded "energetic and cheerful" while reporting these issues.

The caseworker also spoke with Los Angeles Police Detective Maricela Huerta, who asked that DCFS remove P. from Mother's custody, stating that P. appeared to have been coached by Mother to report sexual abuse in order to have Father arrested. Detective Huerta told the caseworker that no charges were brought against Father in either Beverly Hills or Los Angeles. Detective Huerta also provided the caseworker with a video made by Father in which P. is seen pleading with Father not to return him to Mother, "crying and saying 'I hate her,'" and telling Father that Mother was "planning to accuse [Father] of abuse and take custody from him."

Father told the caseworker that P. had a medical condition called "periodic fever syndrome," which caused one-to-two-day fevers every three to four weeks.

3

Father believed that Mother exaggerated P.'s fevers in order to keep him out of school. On October 25, 2013, the caseworker called Mother because P. was not in school and found that Mother had P. out in public with her, rather than at home.

In October 2013, the district attorney investigated Mother's allegation that Father put his finger in P.'s anus and found no evidence of physical or sexual abuse to support the allegation. A nurse conducted an examination and found no evidence of trauma to the area.

On October 31, 2013, the caseworker interviewed P. with a psychologist, who found "no sign of psychosis or hair-pulling" and no symptoms of emotional abuse. P. denied fear of either parent but stated that he preferred to live with Father. In another meeting with P., a public health nurse saw P. report to the caseworker that Mother told him to "tell people that my dad is touching my butt." The nurse described P. as "energetic, healthy, and cheerful . . . , with no missing hair or emotional distress."

P.'s former preschool reported that P. attended school regularly when he was with Father and missed preschool more when he was with Mother. The family law court ordered that Father be the sole holder of educational rights for P. due to Mother's failure to send him to school regularly.

The detention report included a September 2013 Pasadena Police Department crime report, stating that Mother reported that Father assaulted her when she went to pick up Britney at school. Mother told the police that Father had sexually molested Britney and P. in the past. The police officer did not see any visible injuries to Mother. Father denied assaulting Mother, stating that he was at the school speaking with the principal when Mother came in and "began calling him a child molester and a dirty Jew." Father called 911 to prevent Mother from

making false accusations against him, and the dispatcher "could hear [Mother] yelling at him and calling him names."

Paternal aunt reported that she had seen Mother verbally berate her children, and that Mother had made "outrageous claims of abuse" against Father for years, none of which had been substantiated. Another paternal aunt stated that Mother was "teaching [P.] to lie." By contrast, maternal aunt stated that Mother was a good parent and that Father was "verbally aggressive and rude" to Mother. Maternal cousin also stated that Mother was a good parent and that Father was "not 'innocent.'"

A psychologist evaluated P. in October 2013 and found that "he did not show any signs of psychotic behavior (as described by mother), or any other mental health problems or symptoms common for children who [have] been abused or are in distress." However, the psychologist expressed concern that P. was at risk of emotional harm because of his parents' contentious relationship and Mother's "public outbursts" and "negative talk" about P. and Father.

On October 21, 2013, Mother reported to the caseworker and to Foothill Family Services that P. told lies. P. said that "his teacher died and a fire burned down the school in order not to attend school."

On November 20, 2013, P.'s elementary school principal reported that a parent and a 10-year-old student overheard Mother and maternal grandmother leaving school with P., "making derogatory and violent statements against Jewish people. One such statement was that 'Jews should be killed' and that [Mother] hates them ([P.] knows he is half-Jewish)." When asked about the statements, Mother gave the principal conflicting explanations: "it's nobody's business because she has free speech rights"; she spoke in Armenian so the other people could not have understood her; and she was talking to P. about the Holocaust due

5

to her recent visit to the Museum of Tolerance. Father reported that Mother had "a history of making derogatory statements about Jewish people, and that [P.] is conflicted over his father's Jewish heritage."

In December 2013, Mullen, the therapist at Foothill Family Services, reported that Mother called her and yelled at her for thinking P. had been coached to lie. Mullen believed Mother's behavior was inappropriate, stating that Mother "showed no relief" that they did not believe P. had been abused.

At a December 2013 home visit, Mother told the caseworker in P.'s presence that P. had "a 'deformed penis' and it needed to be fixed." The caseworker testified that when P. heard that, he "looked down" and "looked away." The caseworker described Mother's statement and tone as inappropriate, "but consistent with reports of her behavior around him as either harsh or insensitive." A doctor stated that P. did not have "a 'deformed penis,' but a minor correction is needed to a poorly-done circumcision." Father denied that P. had a "deformed penis," but he agreed that P.'s circumcision needed to be corrected.

Mother changed P.'s doctor without telling Father, telling DCFS that Father threatened the medical staff, a report that was denied by the medical office. In January 2014, a doctor reported that P. had symptoms of "periodic fever syndrome," but it was minor. According to the doctor, Mother was overheard telling people in the emergency room that P. could die from the condition, but this was untrue.

A January 2014 progress report from P.'s kindergarten teacher stated that P. was not meeting grade level expectations because of his poor school attendance. In February 2014, P.'s teacher again reported that P. was falling behind, stating that P. completed his homework when he was with Father but was inconsistent when he was with Mother. When the teacher spoke to Mother, Mother blamed P.'s

poor school performance on Father's decision to change P.'s school and Father's failure to pay her for tutoring, not on her failure to send P. to school consistently.

The teacher told the caseworker that P.'s behavior previously had been normal, but in February 2014 she told the caseworker that P. threatened a child at school, saying he would smash the child's head and kill him. P. admitted the threats but did not know why he had made them. In March 2014, P. kicked another child in the groin.

In February 2014, Mother became "verbally aggressive and unruly" with P.'s teacher, threatening to sue the school staff if they failed to give her the names of another child's parents.

At the March 2014 detention hearing, the court found P. to be a person described by section 300, subdivisions (b) and (c) and ordered him detained from Mother and released to Father. The court ordered Mother to have visits monitored by DCFS at the DCFS office.

*Section 300 Petition*

DCFS filed a petition alleging jurisdiction under section 300, subdivisions (b) and (c). Count b-1 alleged that Mother placed P. "in a detrimental and endangering situation" by subjecting him to unnecessary medical examinations and taking him out of school unnecessarily. Count c-1 alleged that Mother emotionally abused P. and placed him at risk of serious emotional damage by making repeated accusations that Father was abusing and neglecting P. Mother thus subjected P. "to numerous interviews with social workers and law enforcement officers, telling the child to give false and misleading information regarding abuse to the child by the father" and to unnecessary medical examinations. The petition further alleged that Mother spoke negatively about Father in P.'s presence; called P. degrading names;

7

and made derogatory statements to P. regarding his paternal religion, anatomy, and mental state. P. had exhibited aggressive behavior due to Mother's alleged emotional abuse.

*Jurisdiction Report and Hearing*

The jurisdiction report contained essentially the same information as the detention report, with the addition of the following: summaries of interviews of Mother, Father, and P.; summaries of statements by paternal relatives; statements by Mother; documents submitted by Mother regarding tutoring for P.; and a statement by Dr. Agarwal, P.'s rheumatologist.

The jurisdiction hearing was held on August 13 and 14, 2014. DCFS presented testimony by Father, two social workers involved in the case, and the dependency investigator's supervisor. Mother testified, and she presented testimony by P.; Dr. Susan Perez, P.'s pediatrician; Terry Greenstein, a former social worker who reviewed the case documents and watched Mother's visit with P.; George Manneh, Mother's fiancé; the babysitter for a baby born to Mother and Manneh; maternal aunt, two maternal cousins, and maternal grandmother; Dr. Agarwal; and Dr. Johnny Wen, a psychologist who evaluated and met with Mother and reviewed the court documents.

After hearing testimony, the dependency court stated that it was difficult to assess the credibility of Mother and her witnesses "because they're all over the place." The court noted that Mother's testimony regarding whether Father sexually abused P. was inconsistent, and that maternal relatives were the only ones who noticed redness in P.'s anal area.[3] The court also noted that anal examinations

---

[3] Maternal aunt testified that P. told her several times that Father put his finger up P.'s butt and that she had seen blood on P.'s butt. Mother's cousin testified that when she

of P. yielded normal results.  The court further stated that P. missed school only during Mother's custodial time, not Father's.

The court found the allegations of the petition to be true by a preponderance of the evidence and found P. to be a person described by section 300, subdivisions (b) and (c).  The court also found by clear and convincing evidence that remaining in Mother's home would pose substantial danger to P., and that there were no reasonable means other than removal to protect him.  The court therefore removed P. from Mother's custody and placed him in Father's home.  The court ordered monitored visits for Mother and ordered her to attend parenting classes, individual counseling, and to undergo a psychological assessment.  Mother timely appealed.

## DISCUSSION

I.     *Evidentiary Rulings*

Mother challenges three evidentiary rulings made by the juvenile court.  She contends that the following rulings violated her due process rights to cross-examine witnesses and to present relevant evidence:  (1) the admission of the jurisdiction/disposition report despite the unavailability of the preparer of the report; (2) the limitation of Mother's cross-examination of the preparer of the detention report; (3) the denial of Mother's request to make P. available for forensic interviews with two experts.

---

helped P. use the restroom at a party she noticed that his bottom was red around his anus.  She also testified that P. often complained about pain in his butt.  Maternal grandmother testified that about seven months before the jurisdictional hearing, she and Mother took P. to the hospital with a 104 degree fever, but Father was not concerned when they called him.  Maternal grandmother had seen P.'s butt "bloody red" two to three times.

A.       *Admission of Jurisdiction/Disposition Report*

On May 23, 2014, a hearing was held to address procedural issues regarding the jurisdiction hearing scheduled for June 5, 2014.  Counsel for Mother asked the court to order or place on call several witnesses for the hearing, including the dependency investigator and the worker who prepared the detention report.  The court ordered all the requested witnesses to be on call.  The June 5 jurisdiction/disposition hearing was continued to August 13, 2014.

The day before the hearing, counsel for DCFS informed the court that the dependency investigator was on vacation, but her supervisor was available.  The court asked Mother's counsel how she wanted to handle the situation, and she replied, "I think those questions can be answered first thing in the morning."[4]  The court ordered the supervisor to be present at the hearing.

At the start of the hearing the following day, Mother's counsel asked the court not to admit the jurisdiction/disposition report "subsequent or based upon [his] cross-examination" of the investigator who prepared the report.  The court asked if counsel had filed a section 355 objection, and counsel replied that he had not because his objection was not based upon section 355.  Instead, it was based on "the bias of the worker and the incompleteness of her investigation."

Later in the hearing, Mother's counsel objected to the admission of the jurisdiction/disposition report, this time on the ground that the investigator who prepared the report was not present as ordered and thus was not subject to cross-examination.  The court overruled the objection, stating that Mother did not "file [section] 355 objections indicating that [she was] objecting to the report coming in unless the worker was available."  The court further stated that the adjudication

---

[4]       A different attorney was standing in for Mother's counsel.

10

already had started and "no one indicated they were not ready to proceed" when the court asked at the beginning of the hearing. The court further stated that if the parties had complied with the court's order to create a timeline together, DCFS would have learned that Mother definitely needed the investigator to testify, and Mother would have learned the investigator was going to be on vacation. Toward the end of the hearing, the court reiterated that, after seeing that Mother requested 16 hours for direct examination despite the court's provision of nine hours for the entire trial, the court directed the parties to confer about the trial. The court stated that, if the parties had done so, Mother's counsel would have learned earlier about the investigator's unavailability for trial.

Mother relies upon section 355, subdivision (b)(2), which states: "The preparer of the social study shall be made available for cross-examination upon a timely request by a party." She contends that after she made a timely request for the preparer of the report to be available for cross-examination, the burden was on DCFS to ensure the preparer was available. She argues that DCFS is attempting to "shift the burden" to her when DCFS had the obligation to make the witness available. DCFS contends that Mother did not preserve this claim for review. We agree.

Section 355 addresses the admission of hearsay evidence in a report prepared by an agency. The statute provides: "A social study prepared by the petitioning agency, and hearsay evidence contained in it, is admissible and constitutes competent evidence upon which a finding of jurisdiction pursuant to Section 300 may be based, to the extent allowed by subdivisions (c) and (d)." (§ 355, subd. (b).) Mother is correct that section 355, subdivision (b)(2) requires the preparer of the social study to be made available for cross-examination upon a timely request by a party. However, the statute further provides that an objection

11

to hearsay evidence contained in such a report is timely "if it identifies with reasonable specificity the disputed hearsay evidence and it gives the petitioner a reasonable period of time to meet the objection prior to a contested hearing." (§ 355, subd. (c)(2).)

Although Mother requested the preparer of the study to be made available for cross-examination, she did not identify any specific objections to the report. Nor did she give DCFS a reasonable amount of time to meet the objections prior to the hearing. Asking the court at the outset of the hearing to "wait on admitting the documents into evidence subsequent or based upon" cross-examination of the preparer of the study provides neither specific objections nor a reasonable period of time for DCFS to address any objections. Similarly, counsel's objection later in the hearing was a general objection to the jurisdiction/disposition report with no identification of the disputed evidence. More importantly, Mother's counsel specifically told the court he was not objecting on the basis of section 355. Mother therefore has forfeited her challenge to the admission of the jurisdiction/disposition report. (See Evid. Code, § 353, subd. (a) [judgment shall not be reversed for erroneous admission of evidence if an objection was not "timely made and so stated as to make clear the specific ground of the objection"]; *In re Joy M.* (2002) 99 Cal.App.4th 11, 21 [failure to make timely objection to evidence and to specify ground for objection insufficient under Evid. Code, § 353].) We therefore decline to address the claim.

B. *Cross-Examination of Preparer of Detention Report*

Mother's second contention is that the court erred in curtailing her right to cross-examine Christie Parkin, the social worker who prepared the detention report. Mother submitted a witness list on August 6, 2014 that included 30

witnesses, including Parkin, with a time estimate of 30 minutes for Parkin's testimony. At the pretrial hearing on August 12, 2014, the court explained that it had discussed various options with Mother's counsel about the timing of the trial, resulting in a two-day schedule with a total of nine hours allotted for the entire trial. The court stated that, for every 30 minutes of direct examination counsel had requested, it would allow four minutes.

At the beginning of the hearing on August 13, 2014, the court explained to Mother's counsel that he should indicate the amount of time he intended to use for each witness, and if he intended to use more than the allotted time, he should indicate which witness's time would be reduced. The court allowed Mother's counsel four minutes to cross-examine Parkin.

Courts have the "inherent power to control litigation before them. [Citation.]" (*Cottle v. Superior Court* (1992) 3 Cal.App.4th 1367, 1377; see also *In re Nolan W.* (2009) 45 Cal.4th 1217, 1231 [ describing "'the inherent power of a trial court to exercise a reasonable control over all proceedings connected with the litigation before it, a power which . . . "should be exercised by the courts in order to insure the orderly administration of justice." [Citations.]'"].) Nonetheless, "[i]t is axiomatic that due process guarantees apply to dependency proceedings. [Citations.] Parties to such proceedings have a due process right to confront and cross-examine witnesses, at least at the jurisdictional phase. [Citations.] The essence of due process is fairness in the procedure employed; a meaningful hearing, one including the right to confront and cross-examine witnesses, is an essential aspect of that procedure. [Citation.] But due process also is a flexible concept, whose application depends on the circumstances and the balancing of various factors. [Citations.]" (*Ingrid E. v. Superior Court* (1999) 75 Cal.App.4th 751, 756-757.)

13

Mother contends that the court's four-minute limit prevented her from conducting meaningful cross-examination because of the length of the detention report. We find no error or abuse of discretion.

Mother requested over 16 hours for direct examination of her witnesses, plus 45 minutes for closing argument, despite the court's allotment of only nine hours total for the entire trial. The court made it very clear prior to the hearing what the time limitations were. The day before the hearing, the court explained in detail all the steps that were taken to accommodate Mother's list of 28 witnesses, including meeting with counsel the week before to come up with a schedule and offering counsel several suggestions on how to manage the allotted time. At the beginning of the hearing, the court reiterated the time limitations. Mother chose to use her time to present numerous witnesses. Furthermore, Mother gives no indication of how she was prejudiced by the time limit. The dependency court's time limit on Mother's cross-examination was within its inherent power to control the litigation. (See *In re E.S.* (2011) 196 Cal.App.4th 1329, 1340 ["A party in dependency proceedings who has a due process right to a meaningful hearing with a right to present evidence does not necessarily enjoy full rights to confrontation and cross-examination. [Citation.] Due process is not synonymous with full-fledged cross-examination rights. [Citation.]".)


C.    *Denial of Request to Make P. Available for Forensic Interviews*

On August 1, 2014, Mother filed a request to make P. available for forensic interviews with Dr. Wen and Terry Greenstein prior to the August 13-14, 2014 trial. Dr. Wen was a neuropsychologist who performed a psychological evaluation of Mother, provided therapy for her, and observed her interactions with her other two children. Greenstein, a former social worker for Riverside County, testified

that the jurisdiction report "was a copy and paste from the detention report" and indicated bias by the preparer of the report. The court set the request for hearing on the first day of trial.

At the August 13, 2014 hearing, counsel for DCFS argued that there was no explanation of the necessity for the interviews or how the interviews would help the court determine whether the allegations of the petition were true. Counsel for P. and counsel for Father objected on the basis of timeliness, stating that the case had been open since March and that the request was not made until August. The court denied the request.

Mother contends that, although the request was made only two weeks before trial, she was not requesting a continuance of the trial because the interview with Greenstein could have been conducted at one of Mother's scheduled visits and the interview with Dr. Wen would have taken only an hour-and-a-half. She further contends that the interviews could have helped the court determine whether P. was at risk of suffering serious emotional damage within the meaning of section 300, subdivision (c).

The court's decision whether to have two more forensic interviews conducted was a matter within the court's discretion. (See *In re Jennifer J.* (1992) 8 Cal.App.4th 1080, 1084 [decision of dependency court in section 366.26 hearing to appoint expert witnesses is "a matter of discretion. Refusal to appoint a second expert to examine any particular issue will ordinarily not constitute abuse of discretion. [Citations.]".) The court's decision not to subject P. to more interviews in order to obtain more expert opinion was not an abuse of discretion.

II.    *Jurisdictional Findings*

15

Mother contends that the dependency court's findings of jurisdiction under section 300, subdivisions (b) and (c) are not supported by substantial evidence. We disagree.

"We affirm a juvenile court's jurisdictional and dispositional findings if they are supported by substantial evidence. [Citation.] 'In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' [Citation.]" (*In re A.J.* (2011) 197 Cal.App.4th 1095, 1103 (*A.J.*).)

"When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence. [Citations.]" (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.) Because we conclude that the dependency court properly found jurisdiction under section 300, subdivision (c), we need not address its finding under subdivision (b).

"Section 300(c) states the juvenile court may adjudge to be a dependent a child who falls within this description: 'The child is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent or guardian or who has no

16

parent or guardian capable of providing appropriate care.'" (*A.J.*, *supra*, 197 Cal.App.4th at pp. 1103-1104.)

In *A.J.*, the court found substantial evidence that the minor was at substantial risk of suffering serious emotional damage where the mother falsely made an abduction report against the father, falsely accused him of pushing her out of a car, and made a false police report against the father, resulting in the father spending two days in jail. (*A.J.*, *supra*, 197 Cal.App.4th at p. 1104.) The minor heard the mother say she would make false reports against the father, and the mother "harassed and disparaged" the father and called friends and neighbors to make disparaging remarks about him. (*Ibid.*)

Mother relies on *In re Brison C.* (2000) 81 Cal.App.4th 1373 (*Brison C.*), in which the court found the evidence insufficient to support the finding of jurisdiction under section 300, subdivision (c). The minor in that case was "caught in the crossfire of his parents' frustration and anger with each other." (*Id.* at p. 1376.) On appeal, the court found that, even assuming the parents' conduct rose to the level of emotional abuse, the evidence did not show that the child was "seriously emotionally disturbed or that he was in substantial danger of suffering serious emotional damage." (*Ibid.*) The court reasoned that there was no psychological testimony to establish emotional damage, and the child had adapted well to being placed in foster care, was physically healthy, doing well in school, and affectionate with his mother. The only indication of emotional difficulty was his "deep dislike and fear of his father," but this was understandable in light of evidence that his father had abused him, as well as his mother, and his half brothers. (*Id.* at p. 1380.) In addition, both parents "recognized the inappropriateness of their past behavior and of commenting to [the child] about the other," had expressed a willingness to change their behavior, and showed no signs

17

that they were "incapable of expressing their frustration with each other in an appropriate manner." (*Id.* at p. 1381.)

In contrast to *Brison C.*, we held in *In re Christopher C.* (2010) 182 Cal.App.4th 73 (*Christopher C.*), that seven children caught in "their parents' tug-of-war for their affections" were at substantial risk of suffering serious emotional harm. (*Id.* at p. 84.) In *Christopher C.*, the record was "replete with inconsistent allegations of sexual and physical abuse," "the constant coaching of the parents caused the children to be unable to distinguish reality from fiction," and the children were "constantly questioned about subjects they did not want to talk about" and "subjected to physical examinations." (*Ibid.*) We distinguished *Brison C.* on the ground that, unlike the parents in *Brison C.*, "the parents have turned a blind eye to the substantial risk of emotional damage to the children that their conduct has spawned." (*Id.* at p. 85.)

We find this case more similar to *Christopher C.* than *Brison C.* Mother accused Father of sexually abusing P.[5] Although she presented her own testimony and the testimony of maternal relatives to support this allegation, investigations by both the Los Angeles and Beverly Hills police departments resulted in no charges being brought against Father, and a nurse who examined P. pursuant to the LAPD investigation found no physical evidence of abuse.

---

[5] Mother contends that she has accused Father of abuse on only one occasion, but that she has been instructed by DCFS and law enforcement to report the incident to other agencies, resulting in multiple reports of the same incident. DCFS does not dispute this contention in its brief, instead arguing that numerous professionals believed that Mother was coaching P. to accuse Father of abuse. Regardless of the number of incidents Mother's accusation was based upon, the evidence establishes that P. made the accusation on at least two occasions, once to Mullen and once to the public health nurse and the caseworker, and that he was subjected to repeated questioning and examinations due to the accusation.

18

In addition to accusing Father of abusing P., Mother called the Pasadena Police Department to accuse Father of assaulting her at Britney's school. Father denied the allegation, and no charges were filed. Mother previously had tried to file a police report when she accused paternal grandmother of injuring P. by cutting his fingernails too short. She also had taken P. to the emergency room for two cuts on his face, claiming that Father abused P., but she was "sent home."

Thus, as in *A.J.*, Mother had a history of making unsubstantiated accusations against Father and his family. Similar to *Christopher C.*, P. was subjected to repeated questioning and physical examinations due to the allegations of abuse. Also similar to *Christopher C.*, several professionals believed Mother was coaching P. to make false accusations against Father.[6] (See *Christopher C.*, *supra*, 182 Cal.App.4th at p. 84 [one of the children discussed an incident as if "she was attempting to memorize a script"].)

There can be no doubt that Mother's accusations that Father abused P., whether true or not, and the resultant interviews and physical examinations P. has undergone have placed P. at substantial risk of serious emotional harm. (See *Christopher C.*, *supra*, 182 Cal.App.4th at p. 84 ["This regimen of psychological welfare cannot help but subject the children to a substantial risk of emotional harm."].) The record shows that P. has shown distress at what he perceives as Mother's attempt to take him away from Father by accusing Father of abuse. Moreover, P.'s story about the school burning down and his inconsistent

---

[6] P.'s testimony about the alleged sexual abuse was inconsistent, at times stating that Father put his finger in his anus and it hurt, and other times denying that Father did so. When he was interviewed for the jurisdiction/disposition report, P. told the caseworker that Mother "lied and said my dad sticks his finger in my butt when I was poo-ing."

testimony regarding the abuse allegation indicates that P. has had difficulty "distinguish[ing] reality from fiction." (*Ibid.*)

The record also shows that P. has begun to exhibit aggressive behavior toward other children at school. Although Mother contends that there is no evidence this is linked to her conduct, a psychologist who assessed P. "believed the pressure for [P.] to adapt to emotional abuse by [Mother] is distressing him more than he can manage."

In addition, Mother's derogatory statements about Father's Jewish religion have caused P. to question his heritage, telling Father that he is not Jewish and telling paternal grandmother "he cannot tell [Mother] that he celebrates Jewish customs with her or [Mother] will be angry."

Unlike *Brison C.*, in which the parents "recognized the inappropriateness of their past behavior and of commenting to [the child] about the other," and had expressed a willingness to change their behavior, the record shows that Mother repeatedly deflected blame and failed to acknowledge responsibility for the consequences of her conduct. (*Brison C.*, *supra*, 81 Cal.App.4th at p. 1381.) For example, P. was falling behind in kindergarten because he missed too much school and did not do his homework consistently when he was in Mother's custody. When his teacher spoke to Mother about this, Mother blamed it on P.'s health, Father's changing P.'s school, and Father's failure to pay her for tutoring. She did not acknowledge responsibility for her failure to send P. to school consistently.

Similarly, when the principal spoke to Mother about the report that she was overheard at P.'s school making derogatory and violent statements about Jewish people to P., Mother gave the principal three inconsistent explanations for her statements: she spoke in Armenian so no one could have understood her, it was no one's business, and it was a conversation about the Museum of Tolerance. When

20

she testified at the jurisdictional hearing, she gave yet another explanation, completely different from the other three, testifying that she was talking about a play her mother had attended at a convention.

"While we agree that '[t]he juvenile courts must not become a battleground by which family law war is waged by other means' [citation], . . . when, as here, [a child is] at substantial risk of emotional harm as a result of being utilized as [a] weapon[] in an ongoing familial fight, the dependency court properly exercises its jurisdiction" in declaring him a dependent child. (*Christopher C., supra*, 182 Cal.App.4th at p. 85.)

III.    *Dispositional Findings*

Mother challenges the juvenile court's order removing P. from her custody.

In order to remove a child from a parent's custody, section 361 requires the dependency court to find by clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody." (§ 361, subd. (c)(1).) Section 361 further requires the court to "make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home." (§ 361, subd. (d).)

"The standard of review of a dispositional order on appeal is the substantial evidence test. [Citation.] In assessing this assignment of error on appeal, the substantial evidence test remains the appropriate standard of review, 'bearing in mind the heightened burden of proof.' [Citation.] We consider the entire record to

determine whether substantial evidence supports the juvenile court's findings. [Citation.]" (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 146.)

"'A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. [Citation.] "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." [Citation.] The court may consider a parent's past conduct as well as present circumstances.' [Citation.]" (*In re A.S.* (2011) 202 Cal.App.4th 237, 247.)

Mother contends that DCFS failed to establish that removal was necessary to prevent harm to P. She cites P.'s testimony indicating that he missed his mother. While the record does indicate that P. loved and missed his mother, this is not the standard by which we review the dependency court's dispositional finding.

Mother also relies on the testimony of Dr. Wen, who performed her psychological evaluation and opined that she did not suffer from any psychopathology and was not a risk to children. However, on appeal, "[w]e defer to the juvenile court's . . . assessment of the credibility of witnesses." (*T.W. v. Superior Court* (2012) 203 Cal.App.4th 30, 47.) Clearly the court did not find this testimony of Dr. Wen to be credible.

There was substantial evidence not only regarding Mother's treatment of P. and the effect of the relationship on him, but also of her failure to acknowledge any responsibility regarding her conduct. As discussed above, she gave four inconsistent explanations regarding her violent, derogatory statements to P. regarding Jewish people. She blamed P.'s difficulty in school on Father's changing P.'s school, rather than acknowledging that the boy did not attend school consistently when he was with her. After contacting Mullen at Foothill Family

Services, she called Mullen and yelled at her for thinking P. had been coached to report sexual abuse. During the time period that Mother was accusing Father of sexual abuse, she never reported any abuse to P.'s doctor. Finally, Mother denied anger management or mental health issues and "denie[d] her role in even the most basic incidents in which there is clear evidence of her negative behavior," such as her "cursing and yelling" at P.'s school about Father or "attempt[ing] to bully and threaten" school staff if they did not give her the names of another student's parents. (See *A.J.*, *supra*, 197 Cal.App.4th at p. 1106 ["Mother has never recognized her bad behavior, has never expressed a willingness to change, and appears incapable of acting in an appropriate manner."].)

Mother contends that the jurisdiction/disposition report indicates that P. is doing better in school. Although the report does state that P. is reaching grade level, it further states that P. has been having issues threatening other students, saying "I will smack your face," and in another incident, telling a student "he was going to 'stab' him in the eye."

Substantial evidence in the record supports the court's dispositional finding.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, J.

We concur:

23

EPSTEIN, P. J.

MANELLA, J.